# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

KERISE ZUTZ,

                    Plaintiff,

v.

FROEDTERT HEALTH,

                    Defendant.

Case No. 20-CV-388-JPS

**ORDER**

## 1.     INTRODUCTION

On March 11, 2020, Plaintiff Kerise Zutz ("Plaintiff") filed the present employment discrimination action, alleging sex discrimination in violation of Title VII of the Civil Rights Act of 1964, interference with her rights under the Family and Medical Leave Act (the "FMLA"), and retaliation for the exercise of her rights under the FMLA. ECF No. 1. On March 15, 2022, Defendant Froedtert Health ("Froedtert") filed a motion for summary judgment. ECF No. 19. That motion is fully briefed, and the Court will grant it.

## 2.     LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*; *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A "genuine" dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court construes all facts and reasonable inferences in a light most favorable to the nonmovant. *Bridge v.*

*New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). In assessing the parties' proposed facts, the Court must not weigh the evidence or determine witness credibility; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010). A court "must bear in mind that [t]his standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues." *King v. Preferred Tech. Grp.*, 166 F.3d 887, 890 (7th Cir. 1999) (internal quotations and citations omitted).

3.    **RELEVANT FACTS**[1]

Froedtert is a regional health system that includes Froedtert Hospital, several regional hospitals, community clinics, and Froedtert & Medical College of Wisconsin Community Physicians. All Froedtert employees are subject to Froedtert's personnel policies. As part of its personnel policies, Froedtert maintains the Corrective Action Policy, which is a progressive discipline policy. Although the Corrective Action Policy is progressive in nature, employees may be subject to accelerated progressive discipline, including discharge, depending on the violation.

   3.1    **Plaintiff's Employment with Froedtert**

Plaintiff was employed by Froedtert in its Pre-Authorization Department, a department which is nearly all female. Her supervisor was Stacy Haass ("Haass"); her manager was Tracy Miller ("Miller"). As a Pre-Authorization Specialist, Plaintiff would gather insurance authorization for patients who were being seen at Froedtert. Within the Pre-Authorization Department, Plaintiff was part of the "procedure work unit," meaning that

---

[1]The parties submitted a stipulated statement of undisputed, material facts. ECF No. 20 at 1–11. For purposes of summary judgment, the Court will adopt the stipulated facts with minor, non-substantive edits.

she was responsible for obtaining insurance authorization for any inpatient, outpatient, or in-office medical procedures.

In her duties as a Pre-Authorization Specialist, Plaintiff would use a software system called "Epic." Epic is an electronic medical records system that keeps track of patient information, appointments, and medical records. It also provides certain employees with access to patient charts. Plaintiff's assignments were delivered to her through Epic. Epic features integration with most insurance companies, allowing eligibility determinations to be made within Epic itself. For the insurance companies that are not integrated into Epic directly, Plaintiff would utilize the insurance company's website for eligibility determinations.

Plaintiff's duties required her to make and receive phone calls regarding authorizations. When engaged in such phone calls, Plaintiff would need to use Epic to access and provide patient information to the insurance company. Plaintiff was also required to document those phone calls within Epic. Even while waiting on hold, the expectation was that Plaintiff would be multi-tasking by completing additional work within Epic. If Plaintiff needed to use the fax machine, it was within a thirty second walk of her desk, and the expectation was that the fax would be entered into Epic as an interaction. Plaintiff had other duties, such as discussing work-related issues with her supervisor and team lead, as well as engaging in team collaboration with peers in handling work queues. Duties like conversations with a team lead or a coworker would not have been recorded in Epic. Plaintiff also received three to four calls per day for different departments, which would require her to ask questions to determine where to transfer the call.

Prior to her employment with Froedtert's Pre-Authorization Department, Plaintiff worked in registration and had experience entering insurance at the Medical College of Wisconsin. This experience allowed Plaintiff to serve as a resource for her coworkers when they needed assistance loading insurance on their computers.

### 3.2    Plaintiff's First Use of FMLA

While employed with Froedtert, Plaintiff was aware that Froedtert had FMLA policies and that Froedtert maintained a leave department called the "LOA Center." Further, Plaintiff utilized FMLA leave from June 12, 2018 until September 2, 2018 for the birth of her daughter. Prior to taking the leave, she did not feel as though anyone at Froedtert was discouraging her from taking it, and, afterward, she did not face any retaliation, discipline, or negative comments for having taken the time off. She did, however, believe that her supervisors may have had difficulties covering her work while she was gone.

When Plaintiff returned from FMLA leave in 2018 following the birth of her daughter, she began taking two thirty-minute breaks each day to express breast milk, as permitted under Froedtert's lactation policy. The room reserved for lactation breaks, however, was not always available, and it would sometimes take her twice as long to express breast milk, having to leave and return to check whether the prior occupant was out of the room. Plaintiff told Haass about her problems accessing the lactation room and believes that Haass notified Miller of the issues.

Moreover, upon her return from leave, Plaintiff received training to refresh her knowledge and to acclimate her to a new assigned work queue. She was also given a thirty-day grace period, during which productivity expectations did not apply. This policy applied throughout the department.

The new queue, however, proved to be time consuming, and, after working the queue for some period of time, Plaintiff asked her supervisor to have the queue rotated between employees.

Even when Plaintiff remained below productivity goals in October, November, and December following her leave, she was spared any disciplinary action or performance improvement plans. Further, Plaintiff was offered the opportunity to adjust her schedule so that she worked four nine-hour days and a half fifth day, in order to assist with childcare. Plaintiff's productivity number for the month of January was 3.96, which exceeded her required goal of 3.29.

### 3.3 The Anonymous Complaint and Ensuing Investigation

On January 8, 2019, Plaintiff's supervisors received an anonymous complaint that alleged that Plaintiff was committing time theft each day. The complaint stated that Plaintiff was engaging in time theft by taking extra time breast pumping, talking on the phone with coworkers, instant messaging others through Lync (Froedtert's internal messaging system), and leaving the work area to go to the cafeteria two to three times per day. It also alleged that Plaintiff would intentionally leave her computer open a lot so that it looked like she was at her desk. In addition to the anonymous complaint, Plaintiff's supervisor also received two other complaints about Plaintiff not working, both from coworkers within Plaintiff's work unit. Plaintiff suspected that the anonymous complaint may have been made by the same two coworkers who complained to Plaintiff's supervisor and who also were competing for a trial work schedule that was being made available to three employees in January 2019.

The complaints regarding Plaintiff were not the first complaints that Plaintiff's supervisor received regarding an employee's productivity. Using

the same investigation procedure used with other complaints, Plaintiff's supervisors started by reviewing Plaintiff's productivity reports. The productivity reports provided information on the daily number of documented "touches" for a particular employee. They also provided information about which payers the employee was interacting with, which was important context because different payers had different expected interaction times. At the time, Plaintiff's supervisors also reviewed her time-punch reports.

After reviewing Plaintiff's productivity reports and time punches, Plaintiff's supervisors had follow-up discussions with Human Resources Business Partner Miranda Diaz ("Diaz") on Friday January 11, 2019. As a result of that discussion, Plaintiff's supervisors decided to have a meeting with Plaintiff to discuss concerns about her productivity. Unfortunately, that meeting was delayed because Miller was out of the office on January 14–15, 2019 and Plaintiff was then out of the office on January 16–17, 2019. As a result, Plaintiff's supervisors could not meet with Plaintiff until January 18, 2019 to discuss concerns about her productivity.

During this same time, Plaintiff was one of three employees in her department who applied for and was chosen for a trial work schedule that moved her shift to 7:00 a.m. to 3:30 p.m. To be considered for the trial schedule, an employee could not be in corrective action, and was evaluated against the productivity and quality of other employees, as well as seniority in the work unit. Plaintiff was granted the schedule change, despite the investigation, because her supervisors wanted to give her the benefit of the doubt while they were still investigating.

At the January 18, 2019 meeting between Plaintiff and her supervisors, her supervisors shared concerns about gaps in her productive

time. Plaintiff recalls that her supervisors told her they were trying to help her improve her productivity numbers. In response to the concerns, Plaintiff went through her day very briefly, because she did not know where the conversation was going. In going through her day, Plaintiff omitted details such as issues she sometimes faced accessing the nursing mothers' room. Although she could not provide a detailed breakdown of her day, Plaintiff explained that the first thing she did each day was check what work she had to do on the computer. She explained that sometimes she would get water or would need to go through faxed-in documentation. She also explained, specifically in regard to her productivity, that she would keep her cases open during the day without saving them, which she thought may have been an explanation for any unproductive time.

Plaintiff also explained that she took her nursing-mother breaks from 10:30 a.m. to 11:00 a.m. and from 2:30 p.m. to 3:00 p.m. She told her supervisors that she had enough time for her nursing mother breaks. Plaintiff also told her supervisors that she rarely left the work area to get food, that the only other breaks she took during the day were restroom breaks, getting water, or talking to others, and that none of her breaks were for extended periods of time. She was not issued any written documentation at the close of the January 18, 2019 meeting.

Following the meeting, Plaintiff's supervisors' next step was to review Epic activity reports; they were not able to receive those reports until January 28, 2019. Epic activity reports show an employee's "active navigation" as they click within the Epic software. In their review, the supervisors looked for activity gaps that were greater than thirty minutes. They also looked for evidence of Plaintiff accepting multiple cases back-to-back, which would account for some time gaps, and considered whether

any particular case would have been time-intensive. The Epic reports showed that there were gaps in Plaintiff's productivity and offered no evidence of Plaintiff keeping multiple cases open during the day and then accepting them all back-to-back.

Plaintiff's supervisors met with Plaintiff once again on January 31, 2019. At this meeting, Plaintiff's supervisors notified Plaintiff, for the first time, about the anonymous complaint they had received about her productivity. Traditionally, Plaintiff's supervisors do not tell employees about complaints right away because they do not want to assume that the complaint is factual. Although they notified her of the complaint's existence, they did not provide her with the details of the anonymous complaint. When asked about specific dates of unproductive time, Plaintiff was unable to recall what happened on those dates because of the time that had passed. Plaintiff explained at the meeting that people would talk to her throughout the day and that she did not want to be disrespectful and tell them that she was unable to converse. Although Plaintiff was shown information about her time gaps at the meeting, she was not provided copies of the written documentation or data substantiating the alleged unproductive time.

At the conclusion of the January 31, 2019 meeting, Plaintiff's supervisors did not believe they had received an adequate explanation for the gaps in Plaintiff's productivity. They did not issue any corrective action at the meeting.

During the investigation into the allegations of time theft, Plaintiff's supervisors did not review Plaintiff's badge swipe reports. They did not believe that the badge swipes would provide clear information because not everyone had to swipe a badge each time they entered the department (e.g.,

when entering with another individual or entering when someone is holding the door open). Plaintiff's supervisors also did not attempt to access Plaintiff's Lync messages during the investigation.

Plaintiff and her supervisors next met on February 21, 2019. There, Plaintiff's employment was terminated. The reason for her termination was time theft, not attendance. As an hourly employee, Plaintiff clocked in and out via a time clock system. Plaintiff was expected to continue working throughout the day, even if she reached her productivity expectations before the end of her shift.

The termination cited multiple examples of gaps in Epic activity. On January 7, 2019, Plaintiff incurred 363 minutes without any Epic activity. When accounting for Plaintiff's two self-reported nursing mother breaks, there was still 300 minutes of time without any Epic activity. On January 4, 2019, Plaintiff incurred 261 minutes of time without any Epic activity. When accounting for the self-reported nursing mother breaks, there was still 200 minutes of time without any Epic activity. On October 3, 2018, Plaintiff incurred 256 minutes of time without any Epic activity. When accounting for Plaintiff's two self-reported nursing mother breaks, there was still 196 minutes without activity. The totals of unproductive time only included large gaps of time—those over thirty minutes—because Plaintiff's supervisors were looking only for large gaps. Although Plaintiff could not explain her gaps in activity, she does not believe that her supervisors fabricated the unproductive time found in the Epic reports.

In December 2018, prior to the allegations against Plaintiff, Haass learned that an employee named Debra Sammer ("Sammer"), who was an Insurance Verification Specialist, was working after punching out. Ms.

Sammer was warned not to continue to do so and then was terminated January 29, 2019 when she repeated the behavior.

### 3.4 Plaintiff's Pregnancy and Subsequent Need for FMLA

On January 16, 2019, two days prior to her first meeting with her supervisors, Plaintiff left work abruptly to see her doctor because she was experiencing bleeding. Later that same day, Plaintiff told Haass that she was pregnant in order to explain why she had left early. Haass was the first Froedtert supervisor Plaintiff told about her pregnancy, and Miller learned about Plaintiff's pregnancy on the 16th as well. Following her sudden departure on January 16, Plaintiff requested, and was permitted, to take January 17 as unpaid time off.

Plaintiff was advised by Haass and Miller that she could apply for FMLA to cover her absence on January 16, 2019. Plaintiff applied for FMLA leave on February 1, 2019 so that her January 16, 2019 absence would not be counted against her. Plaintiff was notified on February 14, 2019 that her leave request was granted. After her FMLA request was granted, Froedtert erased Plaintiff's January 16, 2019 absence. Plaintiff also asked Haass how to use intermittent leave, as Plaintiff had ongoing issues with her pregnancy. During her employment, Plaintiff was never denied any requested FMLA leave.

Pre-Authorization Department employees other than Plaintiff had taken multiple pregnancy-related leaves. Haass herself has taken multiple pregnancy-related leaves. Plaintiff is aware of other employees who have taken FMLA leaves related to pregnancies. Moreover, Plaintiff has no knowledge of any other employees being disciplined for taking a leave.

Miller and Haass were not aware of Plaintiff's pregnancy when they received the anonymous complaint on January 8, 2019. They also were not

aware of her pregnancy when they initiated the investigation into Plaintiff's productivity, or when they attempted to schedule their first meeting with her to discuss her lack of activity.

## 4. ANALYSIS

Froedtert argues that, based on the undisputed material facts, it has not interfered with Plaintiff's rights under the FMLA, has not retaliated against Plaintiff for exercising those rights, and has not discriminated against Plaintiff because of her pregnancy. The Court will address each argument in turn.

### 4.1 FMLA Interference

To establish a claim of interference under the FMLA, a plaintiff must establish that "(1) she was eligible for the FMLA's protections; (2) her employer was covered by the FMLA; (3) she was entitled to take leave under the FMLA; (4) she provided sufficient notice of her intent to take leave; and (5) her employer denied her FMLA benefits to which she was entitled." *Pagel v. TIN Inc.*, 695 F.3d 622, 627 (7th Cir. 2012) (internal quotations and citation omitted). An employee's right to return to work after taking FMLA leave, however, is not unlimited. *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 636 (7th Cir. 2009). An employer "may present evidence to show that the employee would not have been entitled to his position even if he had not taken leave." *Id.* For example, an employer may fire an employee for poor performance if the employer would have fired the employee for such performance regardless of the employee having taken FMLA leave. *Id.* To survive summary judgment, a plaintiff must overcome any evidence that the employer would have fired her regardless of her FMLA leave. *Id.*

Case 2:20-cv-00388-JPS   Filed 05/11/22   Page 11 of 21   Document 28

Here, Froedtert concedes that Plaintiff was eligible for the FMLA's protections, that Froedtert is an employer covered by the FMLA, that Plaintiff was entitled to leave under the FMLA, and that Plaintiff provided sufficient notice of her intent to take leave. The only potential question is whether Froedtert denied Plaintiff any FMLA benefits to which she was entitled. In the parties' stipulated statement of facts, Plaintiff agrees that she "was never denied any requested FMLA leave." ECF No. 20 at 11. Not only were her requested leaves granted, but her supervisor advised Plaintiff on how to use intermittent FMLA. In her response brief, Plaintiff does not address her interference claim. The Court will grant Froedtert's motion as to the FMLA interference claim.

### 4.2    FMLA and Title VII Retaliation

"Employers are . . . prohibited from retaliating against an employee that exercises or attempts to exercise FMLA rights." *Pagel*, 695 F.3d at 631. "In other words, the employer cannot use an employee's use of FMLA leave as a negative factor in promotion, termination, and other employment decisions." *Id.* Employers violate the FMLA not only when they take adverse action in response to specific requests for leave but also when they discharge an employee in anticipation of the future use of leave. *See Myers v. Sunman-Dearborn Cmty. Sch.*, No. 420CV00049SEBDML, 2022 WL 911554, at *6 (S.D. Ind. Mar. 29, 2022).

When an employee raises the issue of whether an employer discriminated against her by taking adverse action against her for having exercised an FMLA right, the question of intent is relevant. *King*, 166 F.3d at 891. "The issue becomes whether the employer's actions were motivated by an impermissible retaliatory or discriminatory animus." *Id.* "An employee may proceed under the direct or indirect methods of proof to

establish a prima facie case of retaliation under the FMLA." *Long v. Teachers' Ret. Sys. of Ill.*, 585 F.3d 344, 349 (7th Cir. 2009). Regardless of the method used, a court must look to the body of evidence of discrimination as a whole and determine whether a reasonable factfinder could infer that the employee was terminated because of her use of FMLA leave.

A claim of retaliation under Title VII is assessed in the same manner as a claim for FMLA retaliation. *Id.* at 1018, n. 2. The only difference is that a plaintiff must establish that she was discriminated on the basis of sex (in this case, pregnancy[2]) rather than for exercising her FMLA rights. Here, the parties rely on similar facts and circumstances for both the FMLA retaliation and Title VII discrimination claims. Thus, the Court need not restate the entire legal framework and will proceed directly to its analysis.

### 4.2.1 Indirect Method

To establish a prima facie case of FMLA retaliation under the indirect method, a plaintiff must demonstrate that "(1) [s]he engaged in statutorily protected activity; (2) [s]he met [her] employer's legitimate expectations; (3) [s]he suffered an adverse employment action; and (4) [s]he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity." *Cracco*, 559 F.3d at 634–35.

The parties do not dispute that Plaintiff was part of a protected class (pregnant women) or exercised a protected right (FMLA leave) and that she suffered an adverse employment action (termination). The parties dispute

---

[2] The Pregnancy Discrimination Act (the "PDA") amended the definition of sex-based discrimination in Title VII to include discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k).

whether Plaintiff met Froedtert's legitimate job expectations and whether Froedtert treated her differently than similarly situated employees.

As to whether an employee was meeting an employer's legitimate job expectations, the Seventh Circuit has noted that the analysis involves a bifurcated inquiry: (1) "whether the employer's expectations were legitimate," and if so, (2) whether "the employee was meeting those expectations." *Dale v. Chi. Tribune Co.*, 797 F.2d 458, 463 (7th Cir. 1986). Positive job performance history does not necessarily matter: "the relevant inquiry is [the plaintiff's] job performance history as known to [the employer] *at the time of his termination*." *Cracco*, 559 F.3d at 635. Plaintiff must show that she was meeting Froedtert's legitimate job expectations at the time of her discharge. *Id.*

Froedtert terminated Plaintiff for time theft. Froedtert made this decision after an investigation that revealed hours of unexplained activity gaps in her work history, even when accounting for her allowed nursing mother breaks and gaps under thirty minutes. Plaintiff was an hourly employee. As an hourly employee, Plaintiff clocked in and out via a time-clock system. Even when Plaintiff reached her productivity expectations before the end of her shift, she was expected to continue working throughout her day. By remaining clocked in even when she was not working, Plaintiff was stealing time from Froedtert and, therefore, was not meeting Froedtert's legitimate job expectations. All said, Froedtert was able to cite multiple dates on which Plaintiff accrued *hours*-long gaps for which Plaintiff could not account. Although it seems that Plaintiff was meeting her *productivity* goals, she was not fired for lack of productivity. She was fired for time theft. Plaintiff has stipulated to the undisputed fact that

Plaintiff was expected to continue working throughout the day, even if she reached her productivity expectations before the end of her shift.

Plaintiff responds that while the time gaps in Epic were not fabricated, they do not provide the complete picture of her time usage. Plaintiff believes that non-Epic activities like phone calls, navigating insurance web sites, speaking with co-workers about work issues, as well as her authorized, non-work related lactation breaks and the challenges she had getting into the lactation room make Froedtert's allegation of time theft implausible and not credible. However, it appears that Froedtert accounted for these types of activities. They discounted her self-reported lactation breaks and non-activity periods under thirty minutes. Plaintiff did not provide explanation for her prolonged non-activity period—she told her supervisors that she did not take long breaks and rarely left her work area. Froedtert was left without explanation and reasonably continued its investigation. Perhaps Plaintiff was, in-fact, working during these times, but, at the time of Plaintiff's termination, Froedtert had no evidence of that possibility. While there may be a dispute of fact as to what Plaintiff was doing with her time, there is no dispute about what Froedtert knew and was told about Plaintiff's unaccounted-for time. Thus, such a dispute of fact is not relevant to the present lawsuit.

Plaintiff, in a separate statement of unstipulated facts, discusses two former Froedtert employees who, Plaintiff alleges, were terminated under similar circumstances but, unlike Plaintiff, were given warnings before termination. ECF Nos. 23 at 6–11, 24 at 2. Sammer, who was not pregnant at the time of her discharge, was caught "working past her time," i.e., working after being punched out from her shift. ECF No. 24 at 2. Froedtert provided her with a formal warning. However, when she was again caught

working past her shift, Froedtert terminated her. ECF No. 23 at 9. Similarly, Weston was also warned about working after her shift; ultimately, she was not terminated. *Id.*

A similarly situated comparator is an employee who engaged in similar conduct. *Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012). Sammer and Weston did not engage in similar conduct to Plaintiff. Plaintiff represented to Froedtert that she was working, by clocking in, yet had hours of time where she was engaging in no work at all. Froedtert was paying Plaintiff for work that she was not completing. Sammer and Weston, on the other hand, were working after punching out, which is arguably the exact opposite of what Plaintiff was doing. Instead of stealing time from Froedtert, Sammer and Weston were selling *themselves* short by engaging in extra work without being clocked-in. Although Froedtert provided back pay to Sammer and Weston, Froedtert was paying them for work they legitimately completed. Froedtert received value for the money it paid to them. Thus, providing them with warning periods was a logical approach. This is not similar to Plaintiff's actions, where she was engaging in conduct that allowed her to receive pay from Froedtert for doing no work at all. Sammer and Weston were not similarly situated to Plaintiff. They were working off the clock, not failing to work while on the clock.

### 4.2.2   Direct Method

To succeed on an FMLA retaliation claim using the direct method, a plaintiff must show that "(1) [s]he engaged in a protected activity; (2) [her] employer took an adverse employment action against [her]; and (3) there is a causal connection between the protected activity and the adverse employment action." *Pagel*, 695 F.3d at 631. Here, the parties dispute only the third element, causation.

To prove causation, a plaintiff can use direct admissions (or near admissions) by the employer or circumstantial evidence "which suggests discrimination albeit through a longer chain of inferences." *Cracco*, 559 F.3d at 636. Circumstantial evidence may include "suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group." *Long*, 585 F.3d at 350. "On summary judgment, in particular, it is clear that mere temporal proximity is not enough to establish a genuine issue of material fact." *Langenbach v. Wal-Mart Stores, Inc.*, 988 F. Supp. 2d 1004, 1019 (E.D. Wis. 2013), *aff'd*, 761 F.3d 792 (7th Cir. 2014) (internal quotations and citation omitted).

The parties dispute only whether there is a causal connection between the protected activity and the adverse employment action. Froedtert can point to legitimate reasons for its termination decision, and there is no indication that these reasons were pretextual. Froedtert initiated its investigation and set a date for the first meeting with Plaintiff prior to Plaintiff telling her supervisors about her pregnancy. While that meeting occurred after Plaintiff revealed her pregnancy and her potential need for FMLA leave, it did so only because of scheduling conflicts. Specifically, Plaintiff needed time off for a pregnancy-related medical issue—time off which Froedtert subsequently approved as FMLA leave. The timing of Plaintiff's termination, although unfortunate, is not suspicious. *Durkin v. City of Chicago*, 341 F.3d 606, 614–15 (7th Cir. 2003) ("An employer cannot retaliate if there is nothing for it to retaliate against.").

Plaintiff also has no evidence that the continuation of the investigation and her subsequent termination was a sham. After their initial meeting with Plaintiff, her supervisors needed time to get the Epic activity

records. Those records showed dates with significant gaps in Epic activity, the key software that Plaintiff used to carry out her duties. In order to make their review as fair as possible, Plaintiff's supervisors only looked for gaps in activity that were greater than thirty minutes, which would remove short breaks, such as restroom breaks, coworker interruptions, and water breaks, from their analysis. They removed the time allotted for her *self-reported* nursing breaks without question. They also considered whether any particular work assignments would have been time intensive and searched for evidence of Plaintiff accepting multiple cases back to back. When meeting with Plaintiff to discuss their findings, her supervisors did not believe that she provided an explanation for the gaps they found in her time records—they accordingly continued the investigation. Plaintiff herself does not believe the unproductive time found in the Epic reports was fabricated.

Further, during the investigation, Froedtert accepted Plaintiff into a trial schedule program, which, based on the parties' description, appears to have been a privilege (employees had to apply for it and undergo a review). She was selected for the trial program on January 14, a few days before she revealed her pregnancy on January 16. The parties both agree that despite Plaintiff having an open investigation into her conduct, she was accepted into the trial "because her supervisors wanted to give her the benefit of the doubt while they were still investigating." ECF No. 20 at 7. Plaintiff stipulated to this fact, and that fact does *not* imply that Froedtert did not seriously begin to consider discharge for alleged time theft until after Plaintiff informed Haas of her pregnancy on January 16. Rather, it implies that Froedtert began taking the investigation more seriously after the

January 18 meeting, at which Plaintiff could not provide satisfactory reasons for her time gaps.

Finally, Plaintiff worked in a department that is nearly entirely female. She previously took a pregnancy related leave in 2018 and did not face any alleged retaliation, discipline, or negative comments from anyone at Froedtert for doing so. Plaintiff is aware of other employees who have taken pregnancy related leaves, yet she has no knowledge of anyone facing discipline for doing so. Other individuals in her department have taken multiple pregnancy-related leaves, including her supervisor, Haass. The department also has a thirty-day grace period following an employee's return from extended leave during which productivity expectations are suspended, which allows employees to more easily transition back into their roles. Plaintiff was even offered the opportunity to adjust her work schedule in order to assist with her childcare needs. The evidence demonstrates that Plaintiff was employed in an environment that was supportive of taking leave, including pregnancy-related leave, and that employees were provided with additional resources upon their return.

**5.      CONCLUSION**

Plaintiff is unable to demonstrate that there is any causal connection between her pregnancy and her FMLA leave and Froedtert's decision to terminate her employment. Under both the direct and indirect methods of analysis, the circumstances surrounding the investigation into Plaintiff and her subsequent discharge undermine any claim of causation. The complaints were made, and the investigation was started, prior to her notice of her pregnancy and need for FMLA leave. The investigation, based largely on Epic time reports, substantiated the complaints made against Plaintiff by her coworkers. Plaintiff was terminated after the investigation into

allegations of time theft found hours of unproductive time for which Plaintiff was paid and for which she could not account. Without a causal connection, Plaintiff cannot demonstrate FMLA retaliation or Title VII discrimination.

For the reasons explained above, the Court will grant Defendant's motion for summary judgment. Perhaps the decision to terminate a pregnant employee for the eleven hours of unexplained missing time in her termination report was not the fairest decision. But there is no evidence besides timing that this decision was based on animus toward Plaintiff for her pregnancy or her use of FMLA leave—and even the timing is not suspect given that the investigation began before anyone knew Plaintiff was pregnant. This Court cannot "sit as a super-personnel department that reexamines an entity's business decisions." *Dale*, 797 F.2d at 464.

Finally, in the light of this Order, the Court will deny as moot the parties' joint motion to amend the trial scheduling order, ECF No. 22.

Accordingly,

**IT IS ORDERED** that Defendant's motion for summary judgment, ECF No. 19, be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that the parties' joint motion to amend the trial scheduling order, ECF No. 22, be and the same is hereby **DENIED as moot**;

**IT IS FURTHER ORDERED** that Plaintiff's claims be and the same are hereby **DISMISSED with prejudice**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED.**

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 11th day of May, 2022.

BY THE COURT:

_____

J.P. Stadtmueller
U.S. District Judge